## Rogers Administrator v. Kosmos Portland Cement Company.

(Decided February 23, 1915.)

### Appeal from Jefferson Circuit Court (Common Pleas Division, No. 4.)

1. Master and Servant—Action for Death of Servant—Failure of Proof—Peremptory Instruction.—In an action to recover for the death of his intestate on the ground that it resulted from the negligence of the master, evidence examined and held that there is a total failure of proof in this regard, and the trial court properly instructed the jury to find for defendant.

2. Master and Servant—Action for Damages for Injury to Servant—Failure of Proof.—Where the circumstances attending the injury show nothing as to the real cause, but leave it to conjecture as to whether it was the negligence of the master or the fault of the injured servant or unaccountable accident, there is a failure of proof.

BENJAMIN F. GARDNER for appellant.

HELM & HELM for appellee.

Opinion of the Court by Judge Nunn—Affirming.

Todd Rogers was 17 years of age and above the average in development and intelligence, as well as willingness to serve.  He was in the employ of appellee, and, on the morning of February 19th, 1913, shortly after he reached the plant for duty, he was missed by his associate employes, and, after a search, his remains were found at the bottom of a huge bin completely  covered  by  the crushed stone contained in it.  Whether he was suffocated or his neck broken is a matter in dispute, but it is not very material which.  In this action to recover damages for his death the court peremptorily instructed the jury to find a verdict for the appellee, his employer, and the administrator appeals.

Appellant, by his pleadings, sets up numerous acts and conditions of negligence on the part of appellee. Among them are, that the boy was ordered and directed to get into the bin in which his body was found; that it was defectively constructed and was a place of danger, and the boy was ignorant of it; that the walkway over the top of the bin was dangerous and unsafe; that the appellee negligently failed to provide a ladder or steps for employes to use in descending into the bin; that the crushed rock and clay were more or less heated and gave forth dangerous gases and fumes; in the alternative it is alleged that the boy came to his death while attempting to descend into the bin pursuant to orders and in the discharge of his duties, or that he fell from the unsafe walkway, or he fell on account of the unsafe means of access to the bin, or was overcome by the gases.  By an amended petition, it is claimed the boy was young and inexperienced and his employer negligently failed to warn him of the danger of going into the bin, and that it was negligent in directing him to go into it under the circumstances.  But, on the trial, appellant's efforts were exerted almost wholly in the attempt to show that it was customary for employes to go into the bin to relieve a clogged condition whenever it occurred, and that the boy went into it in obedience to custom, or to directions then given, and that it was a dangerous and unsafe place for the boy, but the dangers were not obvious or apparent to one of his experience.

The contention of appellant is that the proof showed the above state of facts as being the direct and proxi-

mate cause of the boy's death, and that the court erred in peremptorily instructing the jury to find otherwise. This being the issue on appeal, it is necessary to give a detailed statement of the facts.

The appellant has a large cement mill and operates it day and night with a force of from 100 to 150 employes. The boy began work seven or eight months before his death, and was employed at the request of his father. His duties consisted of dumping cars and regulating the discharge from a screw conveyor into the bin in question, and his place of work was on a platform some 30 or 40 feet from the ground floor. From this platform a mixture of clay and limestone crushed to egg size was fed into ball mills. These ball mills were long cylindrical revolving machines, partially filed with hard round flints or balls. The material being fcd into the mills from the platform, and traveling through their length, is pulverized to pea size, and smaller, by the constantly revolving cylinders and hammering effect of the balls. Before going into the ball mills the material was mechanically dried, and this, together with the friction of the balls, generated some heat, but the proof shows the material, as it was dropped into the big bin, could be held bare-handed without discomfort. The fine material was automatically discharged into a bin at the foot of the ball mills and then elevated by means of a screw conveyor which reached from the ball mill bin back up to the platform, and thence longitudinally across a large steel bin built alongside the platform. This latter is the bin in which the boy was found. It is ten feet wide, twenty feet long, and seventeen feet deep. The walls of the upper ten feet are smooth and perpendicular. The lower part is divided into six hoppers with sloping sides, seven feet deep, so that from the outside the bottom part of the bin has a saw-edge appearance with the saw teeth seven feet long. From the bottom of each of these six hoppers eight inch spouts lead to as many fuller mills, and the pea size material, which has been elevated and discharged into this big bin, automatically feeds through these spouts into the several fuller mills for still further pulverization; that is, to the consistency of ordinary commercial cement. There is an incline track leading up to the platform from a point on the outside where the crushed rock and clay in proper proportions are loaded into cars. A hoisting engine on top of the

platform, operated by Ed Allgood, pulled these loaded cars to the platform, and it was the duty of the boy, Rogers, to dump the cars, so that the contents might feed into the ball mills. Allgood and Rogers were the only employes whose duties required them to be on the platform. On top of the bin and alongside the screw conveyor as it passes full length across the bin is a 25-inch walkway made of two 12-inch planks 2 inches thick. The screw conveyor box is 22 inches square and covered. At proper distances in the box gates are placed with lifting slide-doors. In addition to dumping cars, it was the duty of the boy to lift or close the gates from the conveyor box, in order that the crushed material might be properly distributed into the big bin and thereby each of the fuller mills below get an even feed. To work the gates, the boy would walk out on this plank platform. Naturally, if one gate was left open too long the outflow from it would pile up in pyramid or hay-stack form with its apex at the mouth of the gate, resulting in the gate being damned, and the work of the conveyor interfered with. To relieve this, it was proper to close this gate and open others, and by using a hoe with a three-foot handle, which was kept there on the platform, and, while standing on the platform, he would smooth off the top of the pyramid. There is no controversy about the fact that as to these duties the boy was fully instructed. This material also had a tendency to pack; that is, sometimes it would not flow freely through the hoppers into the fuller mills below. At times some of it would feed into a fuller mill leaving a cavity in the bin at the mouth of the spout with the material arched and crusted over, or else the arch would break and leave the material standing in perpendicular walls around the mouth of the spout. In either event it would cease feeding to the fuller mill. To obviate this a stick or rod long enough to reach from the walk down to the mouth of the spout was kept convenient and used to punch through the crust or to break down the perpendicular walls and start the material flowing. Whether the boy was instructed in the use of this stick does not appear, but that is immaterial. For, if it be conceded that instruction should have been given, it is not claimed that he was attempting to use it, or that it had anything to do with his death. On the contrary, the appellee argues that its presence, and the use it was intended should be made of it, all of which, from its sim-

plicity, the boy certainly knew, rendered absolutely un-
necessary any attempt of Rogers or any one else to go
down into the bin.

We understand that the capacity of the ball mills is
such that in a day shift they crush sufficient material to
run the fuller mills a day and night shift.

Rogers was last seen at the point on the outside where
the mixture was loaded into the cars. His associate,
Allgood, was there cleaning material away from the track
which had been spilled in loading cars. It was 10 or 15
minutes before the day shift went on that morning, and
Rogers came by with a friendly greeting. Soon after-
wards, when Allgood went upon the platform to start
the ball mills he missed Rogers. His shoes were there;
that is, he had apparently come upon the platform and
changed shoes. Allgood started the search; called the
foreman and others. Looking over into the large bin
they could see nothing out of the ordinary; going down
on the lower floor, they found fuller mill No. 5 was not
feeding, and taking off the spout leading from the hop-
per they discovered his feet protruding. Enough of the
material was made to immediately flow out of the big
bin to lower the surface seven or eight inches and leave
his head exposed. Recovering his body, efforts were
made to revive him, but without avail. The hoe with the
three-foot handle was found alongside his body and cov-
ered with the material. There is not one scintilla of
proof that fuller mill No. 5 was not feeding when the
boy came to the plant or that there was any trouble in the
feed at all until it was obstructed by his body. There is
no proof that there was any occasion for anyone going
into the bin, or that the boy was directed by anyone to
go into it or to do anything with reference to it. Neither
is there any proof that during any of the time the boy
worked there that it was customary for the employes to
go into the bin. No one saw him fall in or attempt to
climb into it. There is no proof of any noxious or dan-
gerous fumes arising from the material; on the contrary,
the proof shows that nothing came from it more than
dust arising from the ordinary process of crushing lime-
stone. The walkway over the bin was not broken or de-
fective; it was the same walkway that had been in use
ever since the boy was employed. There is no proof to
show that it was at all dangerous. On one side of it was
the screw conveyor box, 22 inches high, which served as

a barrier, and on the other side and 30 inches high was an iron girder running full length of the walkway. While this girder served as a roof support, it also served as a banister for the walkway. Whether the boy climbed down into the bin with his hoe and in walking over the surface of the material he broke through a thin crust over a cavity at the mouth of No. 5 spout, or whether he fell from the walkway and broke through the crust and was thus covered up, or, in fact, just how he got into the bin will never be known.

The question for us to consider is, whether there was evidence that his death was caused by the negligence of his employer. After a careful consideration of the record, we concur with the lower court in the opinion that there is a total failure of proof in this regard.

Appellant did introduce one witness, a brother of the decedent, who said that when he worked there the walkway over the bin was nothing more than a plank six inches wide. His evidence is not corroborated by any witness and he admits that he is testifying with reference to the time when he worked at the mill, and that was more than a year before the accident occurred. All of the witnesses, both for appellant and appellee, show that the walk at and from the time the boy was employed was made of two 2x12 inch planks, with one inch space between. The father of deceased and another brother, and perhaps one other witness, testified that when they worked at the plant—from two to four years before the accident—they had seen employes go down into the bin, and on one or more occasions had gone into the bin themselves. They say they went in there to relieve the clogged condition of the fuller mills, but their evidence shows that they were volunteers. They do not pretend to know anything of conditions or customs since their employment ceased. This is the only evidence to support appellant's theory that it was customary for the employes to go into the bin, and none of it had reference to the time after the boy was employed. These witnesses also show that the only way to go down was to procure a rope and drop it over the side, and climb down it, or else swing down from some brace rods which run through the bin and were at least seven feet apart. In other words, a man of less reach than seven feet could hardly use the rods for that purpose, unless the bin was half full. On the occasion in question there is no evidence of a rope having been

used, and the material came but little, if any, above the top of the hoppers, and, therefore, it must have been at least ten feet from the top. The testimony of all the other witnesses, both for appellant and appellee, shows that the occasions for going into the bin were rare, and then only when it was necessary to repair it, and special men were delegated for that work. There is no evidence that the boy or other laborers were ever told to go into the bin or saw any others in the bin, or that they had any duties in there.

The circumstances of his death are particularly sad, for there is little doubt that he was attempting some service which he thought would redound to the interest of his master; but, at most, he was a volunteer and had no special orders. The tools and appliances he had to work with were simple, and such dangers as were incident to their use were necessarily well understood by him.

Appellant insists that the witnesses did not give his side of the case the benefit of the whole truth. In other words, he believes, if the truth were known, it would show that the boy was specially directed to go into that bin and relieve the clogged condition of spout No. 5. He thinks that when the boy passed by a fellow-workman on his way to the platform, that this workman, the man in charge of these fuller mills, told him of the defective feed at No. 5, and asked him to go in the bin to relieve the condition. He argues that this position is sustained by the fact that the searchers almost immediately went to mill No. 5 and found no feed going into it. But the proof as to no feed at mill No. 5 shows nothing more than such a condition existing at the time the boy was found, and the presence of his body in the spout obstructing the feed. This man in charge of the fuller mills was an Italian, who could neither understand nor speak English. He was present at the trial and the Italian consul was there to interpret for him, but neither side saw fit to introduce him as a witness. But the proof does show that he had no authority to direct the work of any employe, and, as we have already indicated, there is absolutely no proof that he even attempted to do so.

Appellant relies upon the case of Moseley's Admr. v. Black Diamond Coal Co., 109 S. W., 306. This was where a night engineer fell into a mine shaft unobserved by anyone. His regular place of work was 60 feet away.

The company had failed to comply with a statute requiring the mouth of the shaft to be guarded or protected with a safety gate. The company had enclosed the opening with a fence and provided a gate through which persons might go desiring to enter the mine, but the evidence tended to show that the gates were standing open and could not be closed on account of refuse, coal and other material that had accumulated and was allowed to remain about the gates. For these reasons the court held that the company had failed to perform its statutory duty. While no one knew the occasion of his going to the shaft, yet his duties made it proper for him to go there and look after certain parts of the machinery thereabouts. The court recognized the rule laid down in the cases of Hughes v. C. & O. & T. P., 91 Ky., 526; Wintuska's Admr. v. L. & N., 20 S. W., 819, 14 Ky. L. R., 579; Vissman v. Southern Ry. Co., 89 S. W., 502, 28 Ky. L. R., 429, 2 L. R. A. (N. S.), 469, to the effect that the servant must produce some evidence conducing to show that the injury was caused by the negligence of the master or someone having authority to represent him; that negligence will not be presumed; but where the injury or accident may have happened in two or more ways, in one of which the master would be liable, and the other not, and presumptions as to how the injury or accident happened are equal, a recovery will be denied. Moseley's case was distinguished from the ones referred to in view of the fact that the company was shown to be clearly negligent, and that the open gate was the proximate cause. In the case at bar the appellee has not been shown to be guilty of any negligence, statutory or otherwise, and it makes no difference which one of the suggested causes of death may be accepted, we are unable to see how it can be said that any negligence of the appellee caused it.

Neither can we find any analogy in the case of the Standard Oil Co. v. Eiler, 22 Ky. L. R., 1641, or in the case of Southern Ry. Co. v. Mouck, 152 Ky., 498, relied on by appellant. In the Eiler case, a seventeen-year-old boy was left in charge of a grinding mill without any instructions as to its use or operation, or warning as to danger that would attend an effort to unchoke a spout through which it discharged the material. In trying to relieve that condition he took off the spout and ran his fingers up in the mill to loosen the material, and they

were caught by the machine and crushed. But the boy Rogers was not left in charge of any mill or machinery. There was no controversy as to how Eiler received his injury, but no one knows how Rogers came to his death.

The principle of law applicable to and decisive of this case is stated in C. & O. v. Walker's Admr., 159 Ky., 237, as follows:

"Where the circumstances attending the injury show nothing as to real cause, but leave it to conjecture as to whether it was the negligence of the master or the fault of the injured servant or unaccountable accident, there is a failure of proof."

We do not believe this case is as strong for appellant even as the Walker case, because there is no proof of any negligence upon the part of the master.

For the reasons indicated the judgment of the lower court is affirmed.