# Codell Construction Co. v. White.

(Decided Dec. 5, 1933.)

MORRIS & JONES for appellant.
POLK SOUTH, Jr., for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

This appeal requires a review of a trial of an action before a jury by the administrator of William White against the Codell Construction Company, for the death of White, charged to have been the proximate result of the company's negligence. The Codell Construction Company, a corporation, in November, 1931, and prior thereto, was under a contract with the state highway commission to build the Frankfort-Owenton Highway, Franklin county, Ky. It was operating under the Workmen's Compensation Law (section 4880, Ky. Stats. et seq.): but whether White had accepted its provisions (section 4957, Ky. Stats.) does not appear. On October 28, 1931, White began work as a night watchman for the Codell Construction Company at a point on the Owenton pike, about four miles from his home and nine miles from Frankfort. His duty was to "grease," and also to fill with gasoline the tanks of, certain machinery from

the time he began work in the evening and before the time for its use the next morning. He was provided with a five-gallon can with which to transport the gasoline from the gasoline storage tank to the tanks of the machinery, and for the purpose of pouring it into the tanks, he was furnished a funnel of the capacity of five gallons. The gasoline was drawn by a faucet at the bottom of the storage tank into the five-gallon conveyor and carried by White to the different pieces of machinery where it was poured into the tanks with the use of the funnel. The machinery, which he was employed so to supply with gasoline, consisted of three iron "mules," a shovel, and a compressor. Each tank of the "mules" held about eighteen gallons; that of the shovels about fifty or fifty-five. The quantity to fill tank of the compressor is not definitely shown. No officer of the Codell Construction Company was engaged in the construction or supervision of the construction of the highway, nor in controlling the machinery. The direction of the work of all employees and the handling of the machinery were under the control of a superintendent and other employees. The employees, after November 1st, quit work, left the machinery near the gasoline storage tank, about 4:30 p. m., and returned next morning and began their work between 6 and 6:30 a. m., except the superintendent, mechanic, and blacksmith, who almost invariably arrived at the place where the machinery was located, about daylight or before.

At the time White was employed, his brother, Walter Webster, and Ben McDonald were present. They heard White inform the superintendent that he desired the job of night watchman. They claim the superintendent at that time made these statements, "I am looking for this machinery to be oiled, greased and gassed, up ready to go to work when the men come of a morning"; "All I am looking for you to do is to grease and gas up and have this machinery ready to go to work when they come of a morning." Talbott, the superintendent, claims that he also stated to White, "You don't have anything to do, but watch the gasoline tank," and "We have three 'mules' and a shovel there, if he would fill them up," "We would pay him $2.50 a night"; that "He could get there before dark and fill them up before dark at night or fill them up before they went to work in the morning after day-

light''; and that ''He accepted employment under those terms.'' The brother of White, Webster, and McDonald claim they did not hear these statements of Talbott. Kirkland claims he heard Talbott one afternoon tell Wihte ''to gas up before dark and after daylight.'' Smith, the mechanic of the Codell Construction Company, claims that after White began his employment, White asked him for a lantern and next morning informed him, Smith, that he had found one when he directed White ''to always fill (the gas tanks) before dark and if he did not get it done, he could fill after daylight the next morning.'' and that he, Smith, ''warned him not to fill after dark.'' White was not furnished a lantern for any purpose whatsoever; nor was he furnished·oil therefor by the Codell Construction Company, but obtained one owned by the Company, of his own accord to be used at his own direction. The employees of the Codell Construction Company disclaim any knowledge of his using the lantern while handling the gasoline or filling the tanks therewith, or of his intention to use it for that purpose. His use thereof, while handling gasoline or filling the gasoline tanks, was without the knowledge or consent of the other employees of the Codell Construction Company. The contrary is not attempted to be shown by the administrator. Some of the other employees of the Codell Construction Company knew he had obtained and was using the lantern, but had no knowledge or information that he was using it while handling or transporting gasoline from the storage tank to the tanks of the vehicles. The other employees of the company also disclaim knowledge of his handling or transporting and pouring the gasoline into the tanks of the vehicles he was to fill therewith, after dark or in the nighttime. The contrary is not shown by the evidence in behalf of the administrator. Travelers on the highway had observed White in the nighttime with the gasoline can in one hand and a lantern in the other, going from the gasoline storage tank to the vehicles.

On the evening of the 14th of November, White arrived at about 4 o'clock p. m. at the place at which he was to discharge his duties as night watchman, including the greasing of the machinery and the filling of the tanks with gasoline. The other employees of the Codell Construction Company, on placing the machinery

where it was left for the night, departed for their respective homes. After their departure, until some time between 8 and 9 o'clock in the night, the whereabouts of White and what he was doing are not shown by the evidence. On that night between 8:30 and 9 o'clock, Wade Hampton and his wife were at home, about a quarter of a mile from where White was performing his duties as night watchman. They heard some one "hollering"; the person engaged in "hollering" came to their home and, one his arrival, they discovered it was White. He had a coat around his head, a couple of quilts and a comfort around him. To them White "said he was working up there and filling up a 'mule' or truck or something, he spilled gas and got afire"; White was excited and literally broke into the house of the Hamptons. The Hamptons had been asleep, but were awakened by the "hollering" of White. Wade Hampton gave White a drink of water, and started with him in a car as quickly as he could, with the view of conveying him to the hospital. On the way, he turned him over to Wallace Johnson who had a closed car. White got into Johnson's car and was conveyed about six miles to the King's Daughters' Hospital at Frankfort. On his arrival it was discovered that his entire body was severely burned. He died, intestate, on the 15th day of November.

His administrator, on a trial before a jury, recovered $10,000. At the conclusion of the evidence in behalf of the administrator, and also at the close of all of the evidence, the company requested an instruction directing a verdict for it, and of the court's refusal to give the peremptory instruction, it now complains.

The administrator, to support the charge of negligence, theorizes thus:

"Gasoline vaporizes almost instantly upon coming in contact with oxygen. So that in common use, as soon as gasoline is exposed to the air, some of it, at least, always goes off in the form of vapor, which vapor, being heavier than the air, tends to sink. The gravest source of danger with respect to handling gasoline is that since this vapor sinks it is not readily perceptible to one standing, * * * because it is along the lower levels and close to the floor (surface), and if it is not agitated by the atmosphere

so as to dissipate and blow away out of the room, is likely to be ignited by coming in contact with flame, the ignition causing an explosion. * * * This vapor, unless dispelled by a current of air and dissipated, is likely to travel considerable distance * * * and will almost inevitably contact with any flame.''

And he postulates thus wise:

''The appellant created the unsafe place for the decedent (White) to work in, by bunching the machinery around the gas wagon, so as to create a field of gas fumes and vapor when decedent filled the 'mule.' No doubt the appellant thought that it was making the decedent's work easier for him, in bunching the machinery around the gas wagon, with the exception of the shovel which could not be moved and was left on the grade. But, as a matter of fact, it was making the place more dangerous by reason of the vapors which the decedent knew nothing about, and it would have been safer for him if the machinery had been strung out on the grade and not bunched around the gas wagon. The appellant admits it furnished the decedent with an oil lantern to work with, but contends he was not to fill the machinery during the night time. The average person does not know of the dangerous qualities of gasoline vapors and of its tendency to seek the low levels. Certainly, the decedent, William White, did not know this fact, or he would not have set the lantern on the ground.''

We find in such presentment no substantiation of his cause of action, nor a suggestion of the semblance of actionable negligence on the part of the company or its employees.

White was 26 years old, a farmer, and, when not engaged as such, he worked at the trade of a carpenter and paper hanger, with sufficient skill to enable him to earn from $2.25 and $2.50 a day. He had actual experience in the operation of an automobile for his own pleasure, for a period of from 5 to 7 years. He had passed either the first or second year high school and by nature was an intelligent man.

It is not disputed that from 30 to 45 minutes was

required to fill the tanks of the machinery with gasoline. He arrived on the evening of the 14th about 4 o'clock to begin his work; his clothing was ignited and he was burned somewhere between 8 and 9 o'clock; what he did during the interim; how his clothing caught on fire; what he was actually doing at the time they were ignited, and why he was at work at that time of night, are all matters of conjecture, surmise, and speculation, neither of which is sufficient upon which to rest a verdict of a jury. The condition next morning of the lantern, can, and ground corroborates his statement to the Hamptons. There is no evidence shedding any light on these subjects, except his statement to the Hamptons. But his statement to them and the condition next morning of the can, lantern, ground, and iron "mule" are not sufficient to establish negligence on the part of the company. Such evidence does not show the company's failure to observe any duty it owed him. Horse Creek Mining Co. v. Frazier's Adm'x, 224 Ky. 211, 5 S. W. (2d) 1064; Hurt v. L. & N. R. Co., 116 Ky. 545, 76 S. W. 502, 25 Ky. Law Rep. 755; Black's Adm'r v. Southern R. Co., 108 S. W. 856, 32 Ky. Law Rep. 1345; Rogers' Adm'r v. Kosmos Portland Cement Co., 163 Ky. 84, 173 S. W. 317; Little v. Consolidation Coal Co., 169 Ky. 514, 184 S. W. 873; Stephens v. Kitchen Lumber Co., 222 Ky. 739, 2 S. W. (2d) 374.

He had been directed and warned not to fill the tanks after dark or in the nighttime. Without such information it is obvious that his own experience, gained from the operation of an automobile, was sufficient to apprise him of the impending danger incident to handling gasoline near the flame of a lighted lantern.

Also, the inflammable and explosive nature of gasoline was well known to him as a matter of common knowledge. His knowledge of handling it, and the extreme danger of doing so in close proximity of a lighted lantern, was equal to that of the other employees. The likelihood of his spilling the gasoline when in the act of filling the tanks and the hazard and danger of his use of a lighted lantern while so engaged, to his own person and life, were apparent to his own intelligence. The company was not an insurer. Fuller v. Illinois Cent. R. Co., 138 Ky. 42, 127 S. W. 501. It was not its duty to have another present to intercede and prevent

him from filling the tanks after dark with the use and aid of a lighted lantern. The mere fact he was filling a tank, if he were doing so at the time he sustained his injury, with the can and funnel, furnished him by the company for that purpose, with the aid of a lantern he had, himself, hunted up and was using at the time he spilled gasoline on himself when the vapor therefrom was ignited by the flame of the burning lantern, falls far short of establishing actionable negligence on the part of the company.

The relation of master and servant is based on their contract, either expressed or implied, and its terms and conditions must be looked to, to determine the duties which each owes to the other, so that it may be ascertained what acts of the employer may constitute negligence as applied to the employee. Chesapeake & O. R. Co. v. Harmon's Adm'r, 173 Ky. 1, 189 S. W. 1135, Ann. Cas. 1918B, 41; Fee's Adm'r v. Mahan-Ellison Coal Corp., 241 Ky. 231, 43 S. W. (2d) 681.

Under his employment with the company, according to the uncontradicted testimony of Talbott and Kirkland, corroborated by that of Smith, he was employed to fill the tanks with gasoline in the evening before dark or next morning after daylight. His filling of the tanks after dark was a disregard of his duties under the contract. The burden was on the administrator to prove the existence of actionable negligence on the part of the company and that the decedent's injury directly resulted therefrom. Watson's Adm'r v. Louisville & N. R. Co., (Ky.) 114 S. W. 292; Royal Collieries Co. v. Wells, 210 Ky. 600, 276 S. W. 515; Nugent Sand Co. v. Howard, 227 Ky. 91, 11 S. W. (2d) 985; Faulkner v. Gatliff Coal Co., 228 Ky. 379, 15 S. W. (2d) 236; Kelly & Shields v. Miller, 236 Ky. 698, 33 S. W. (2d) 662; High Splint Coal Co. v. Bailey's Adm'r, 238 Ky. 217, 37 S. W. (2d) 22; Crouch v. Noland, 238 Ky. 575, 38 S. W. (2d) 471.

In Crouch v. Noland, 238 Ky. 575, 38 S. W. (2d) 471, 472, a domestic servant while endeavoring to start a fire in the kitchen stove with kerosene sustained a burn. Her employer, in passing through the kitchen, had observed her pouring oil out of an open can and suggested that if she put it in the coal oil can, she would not spill it on the floor. In starting the fire in the

stove with it, she was burned, for which she sued her employer. She testified she did not know there was any danger in the use of crude oil and knew nothing about its inflammable and explosive nature, although realized from its use that it burned readily. On a trial before a jury she recovered a judgment of $1,500. On an appeal to this court, a peremptory instruction was directed to be given for her employer. In the course of our opinion we said:

"As an abstract statement of the law relating to the duty of the master with respect to using care to furnish his servant with safe materials, little fault is to be found with the instruction. But there is an additional or qualifying rule, and that is that a master is not required to warn a servant of ordinary intelligence, knowledge, or experience of dangers so obvious or well-known that he is presumed to know of their existence. L. & N. R. R. Co. v. White, 221 Ky. 1, 297 S. W. 808; 11 R. C. L. 698. The appellee was at the time nearly 21 years of age, had an eighth grade education, and resided in an oil-producing community, with her uncle, in whose home she lived, and who was engaged in that line of employment. She was not an immature or ignorant child, but judging her by the record, possessed at least average mental faculties. She is presumed to have the common sense of an adult, and is to be held to the same degree of care. L. & N. R. R. Co. v. Hutton, 220 Ky. 277, 295 S. W. 175, 53 A. L. R. 1328. The inflammable and combustible nature of crude oil is of that character of scientific fact that the courts consider to be one of common knowledge. Port Terminal R. R. Co. v. Brimer (Tex. Civ. App.) 19 S. W. (2d) 111. If she was ignorant of the fact that crude oil possessed the dangerous properties of kerosene, as claimed, there is nothing to show that her ignorance was brought to the attention of her uncle and employer. Although having knowledge of her use of the oil in starting fires, he had no reason to assume that she would use it in the hazardous way she did, and was not required as a matter of law to warn her against that hazard. L. & N. R. R. Co. v. White, supra. It is not sufficient to prove an injury by an accident. Some act of negligence on the part of the master

which was the proximate cause of the accident must be shown. Staley v. Wehmeier, 187 Ky. 445, 219 S W. 408.''

The pronouncement of this case ought to be, and is, conclusive of every contested question in the pending one.

The administrator asserts "there was an abundance of evidence to submit the case to the jury and to support the verdict." To sustain this position he cites Perry's Adm'r v. Inter-Southern Life Ins. Co., 248 Ky. 491, 58 S. W. (2d) 906, St. Louis, I. M. & S. R. Co. v. Owens, 103 Ark. 61, 145 S. W. 879, Lynn v. Roberts (Wimbush v. Roberts), 257 Mich. 116, 241 N. W. 214, Cornec & Co. v. B. & O. R. Co. (C. C. A.) 48 F. (2d) 497, Standard Oil Co., etc., v. Hydrick, 174 Ark. 813, 296 S. W. 708, and Gatliff Coal Co. v. Ramseur's Adm'x, 191 Ky. 10, 228 S. W. 1028, Louisville & N. R. Co. v. Snow's Adm'r, 235 Ky. 211, 30 S. W. (2d) 885, and many other cases in which circumstantial evidence was relied upon, either to authorize the submission of the case or sustain the jury's verdict.

A typical example of the cases cited, in which circumstantial evidence therein adduced was held to be sufficient to authorize the submission of the issues to the jury, is Perry's Adm'r v. Inter-Southern Life Ins. Co. The relation of master and servant was not involved in the case. The rule therein announced, as well as in the other cases cited by the administrator, in no wise contravenes, or supplants, the principles quoted herein from Crouch v. Noland. Illustrative of the insufficiency of circumstantial evidence to authorize a recovery of a master for death or injury of a servant, attention is directed to Fee's Adm'r v. Mahan-Ellison Coal Corp., 241 Ky. 231, 43 S. W. (2d) 681, and cases therein cited.

There is no conflict of evidence on the major issue in this case; and there was no eyewitness of the accident involved. The uncontroverted facts and circumstances not showing culpable negligence of the company, it is not doubtful that the court erred in refusing to direct a verdict for it.

The judgment is reversed with direction to award it a new trial and for proceedings consistent with this opinion.