# Southern Mining Co. v. Saylor.

(Decided April 28, 1936.)

As Modified on Denial of Rehearing June 19, 1936.

656

N. R. PATTERSON and T. E. MAHAN for appellant.

GOLDEN & LAY for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

This appeal requires a review of the pleadings, the evidence, and the instructions of the court.

As a basis of his recovery, Tony Saylor alleges that he "was inexperienced in coal mining and the dangers incident thereto," at the time he began work in the mine of the Southern Mining Company, and "notwithstanding his inexperience and lack of knowledge of the dangers incident to coal mining, and especially in the defendant's mine at the place where he was directed to work, the defendant with gross negligence and carelessness failed and refused, at the time he was employed and directed to go to work for the defendant in its said mine, to advise him of the danger incident to working in its said mine, and after he began working for the defendant as aforesaid it negligently and carelessly failed to keep a careful watch

over the timbering in its said mine, and especially of that part of its said mine where the plaintiff was directed to work, and where plaintiff received the injuries hereinafter complained of.'' It ''negligently and carelessly failed and refused to visit and examine his working place as was its duty and to direct and see that same was properly secured by props and timbers, so as to make same a reasonably safe place for him to do the work required of him.'' It ''with gross negligence and carelessness directed the plaintiff to continue working in his said working place, and assured him of the safety of said place at a time when his said working place was dangerous and unsafe,'' which it knew to be unsafe and dangerous, or could have been known by the defendant by the exercise of ordinary care on its part; ''and as a direct and proximate result of said negligence and carelessness, and gross negligent and careless acts and omissions aforesaid, plaintiff's working place was dangerous and unsafe, and as a direct and proximate result thereof, on the part of the defendant a large mass of rock and slate fell from the roof of its mine at his working place, striking and injuring him.''

By an amended petition he stated specific statutory duties of the Southern Mining Company and alleged that the roof of the mine was ''unsafe and dangerous'' and that it and its employees superior to him knew ''that all of same were dangerous and unsafe or could have known of same by the exercise of ordinary care on their part,'' but that he did not know that the roof was dangerous or unsafe, or that the timbers were insufficient to hold it, and he could not have known of it by the exercise of ordinary care on his part. In this amendment he further alleged that the coal company or its employees superior to him ''did not advise him of the dangers or any dangers incident to his work in its said mine, but it was its duty to advise him as to the dangers incident to his working in its mine, but that it and its employees superior to him negligently and carelessly failed and refused to advise him of the dangers incident to his working in its mine, though it and they knew that the place where he was working when injured was dangerous and that he did not know that the same was dangerous and

could not have known of same by the exercise of ordinary care on his part." "The defendant company, its agents and servants superior to him, negligently and carelessly failed to inform him or make known to him any of the dangers and he says further that the defendant company knew that he was a young and inexperienced miner."

The company traversed the petition as amended and pleaded its rules, and alleged that they "were, and became a part of his contract of employment and it became the duty of Saylor to observe and conform to all of said rules." It further pleaded special facts constituting contributory negligence on his part. The answer was traversed by a reply.

The jury's verdict was for $7,500.

Saylor's evidence substantially is that on March 13, 1934, as an employee of the Southern Mining Company, he sustained an injury from the falling of a slab of slate, called a "horseback." He was working in what is known as a "break through." "It is a narrow (seven or eight feet in this case) connecting channel between two rooms and driven for the purpose of permitting a better circulation of air." Forty feet away on the opposite side Arthur Flannery was engaged in driving a similar "break through."

He testified that he had only had experience as a coal loader and "chalk eye" for about three and a half months before he began working for the Southern Mining Company. Neither at the beginning of his work nor before he was injured did any one in behalf of the company give instructions, or impart information, to him, concerning the dangers incident to working in the mine. After working about three weeks, because his place of work was dangerous, he reported to the mine foreman that he was "afraid of getting killed and wanted a safer place," when the foreman directed him to "pitch his tools out," and he would give him another place.

The next morning the foreman took him to a place called the "main butt," and stated to him, "Here is a safe place, I will put you in here." The "main butt" was something like a mile and a half or two miles

from the entrance. Saylor stated that after the coal was cut with the machine he did nothing to tear it loose or burst it out. When it was cut it dropped down from the roof. He set a timber four and a half feet from the coal. He testified the timber was the only one he had. He was injured in this "break through." The "break through" had been under cut the second six feet. This cutting was done by the other employees with a machine, gouging out underneath the coal, and at its bottom, for a distance of about six feet, forward; width seven or eight feet, and thickness of four or five. On the morning before he was injured, he sounded the roof, "like the rest of them." It sounded solid and he could not detect anything wrong, "Though he beat on it pretty heavy." He "took a pick and hammered it," "just a short time before the 'horseback' fell." A mine boss about five or ten minutes before he sustained his injury came to where he was working, "squatted down," and said: "How is this place;" followed with the statement: "It is alright;" Saylor said to him: "This place is alright, you say;" and he responded: "Yes, all we want is getting that D—— coal." Saylor claimed he relied on the boss' statement. The boss at the time neither inspected the "break through," or the timber, nor sounded the roof. He "only looked at it," without a lamp, which was on his head. He remained five to ten minutes. Saylor then loaded about a half dozen shovels of coal, sat down on a shovel to make a cigarette, when a "horseback" fell, injuring him. He did nothing to make it fall. "A 'horseback' is long, rather 'thin around,' and a 'kettle bottom' is more of a round piece of rock." They appeared in the roof of the mine where Saylor was working, probably one every two cuts.

Flannery testified that the "bosses" of the mine all knew of the presence of the "horsebacks," and "kettle bottoms." They could be discovered by an experienced miner or boss, sounding the top of the roof of the mine. If either was loose and not very heavy, it sounds "drummy," but if heavy, it sounds "dead" and slightly "drummy." He was asked an answered as follows:

"Q. How often did these mine bosses come and inspect your working place? A. To my know-

ing, they have been inspected very seldom. Sometime we wouldn't see them for two or three days at the time."

Flannery further testified that if before the "horseback" fell a timber had been set about four feet from the face of the coal, it would have helped hold up the "horseback." On cross-examination he stated that when he first entered his place to load coal he observed that Saylor's timber was not properly set. It was not set straight, and "not enough timbers set and the 'draw rock' was giving down to some extent." Of this situation he claims he notified the "mine boss," telling him the manner in which Saylor was doing his work, and informed him that he was not setting a sufficient number of timbers in the place and the way he had set one, showed he was "a green horn miner" and he would have to watch him; when the "boss" stated: "'Just let him go, he will live and learn." Flannery claims that while pushing a car Saylor's "got too fast and ran over his heel, bruised and skinned it." He became angry and while still angry about it, he informed one of the "mine bosses" who said: "Let him go, he is a 'green horn' anyhow." Only one timber had been set by Saylor, and Flannery stated that another should have been set in the center after about half of the second cut of coal had been removed.

Arthur Hubbard, shortly before Saylor was placed at work in the "main butt," had worked at that place. He stated that Vance, a foreman, came to the place one morning; the slate was hanging, when Vance stated: "That is pretty bad, ain't it?" Hubbard responded: "Yes, it is in pretty bad shape." Vance directed him to take his tools and go on the right second south and work over there, and "we will put somebody else in this place, that don't know anything about it." He further stated there were "horsebacks" and "kettle bottoms" all through the room, and "great slugs of slate hanging loose"; the general condition of the mine at that place was bad. Later, Hubbard claims he said to Jonas Jones, the superintendent of the mine, that "Mr. Saylor ain't doing much good in that room where he is at," and "If I was you, I would change him to some place else; he has got a big family." Jones responded: "He ain't any account, just let him

stay in there." Thereafter Saylor sustained his injury.

Westel Peace, a mine foreman, was at Saylor's place of work at 8 o'clock on the day before he sustained his injury. Saylor had taken out one cut and the removal of the second cut had not been started. One timber had been set by him "practically five feet from the face of the coal," or ten and a half feet from the face of the coal after the second cut was removed. At the time he was there the day before, he made no inspection of the roof or Saylor's place of work. He observed that Saylor was slow and "didn't seem to care whether he did anything or not." He stated that he noticed Saylor was careless in the way he had set his timber and he called his attention to it. He "supposed" that Saylor knew how to take down the top. "He had showed him how to take it down." He was further asked and answered as follows:

"Q. In this sort of place, irrespective of the top, what is the first thing he should do? A. To set another safety post.

"Q. How many cuts should he take out before he sets another one? A. He should set one every cut—at least that many.

"Q. Do you know whether this was done in that place? A. It didn't show any indication of but one timber.

"Q. You found one timber about ten feet from the face? A. Yes, approximately ten feet from the place.

"Q. After the first safety timber, if any safety timber had been set in that second cut, would that have held this thing up? A. I believe it would."

Millard Vance, an assistant mine foreman, stated that he was at Saylor's place of work about 7:30 a. m. on the morning of the day next before he was injured. One cut of coal in the "break through" on the right-hand side of the room had been taken out at that time by Saylor. One timber was set. He was asked and answered:

"Q. Where was the prop setting? A. Setting under the edge of the first cut.

the removal of the second cut had not been started. going up in the room.

"Q. Which edge? A. On the right hand side A. About five and a half feet deep and about eight or eight and a half feet wide. * * *

"Q. Did you see that timber (after Saylor was injured)? A. Yes sir.

"Q. Where was it with reference to where you had seen it the first time? A. The same place out at the edge."

J. H. Smith, a miner of twenty-seven years of experience, described the duty of a foreman when he goes into a man's working place, thus:

"He should examine the place to see if it is safe and if it is not safe, he should notify the working man to make it safe, and if he can't he should put somebody in there to make it safe."

He was asked and answered these questions:

"Q. How does he examine that place? A. He examines the top with a pick.

"Q. What does he do about the timber? A. The coal loader should have his timbers up before the mine foreman comes in there.

"Q. If he does not? A. He should make him cease work and set his timber.

"Q. And tell him the location to put them and sound the top? A. Yes sir."

It is fair to the Southern Mining Company to state that those in charge of the mine superior in authority to Saylor claim that they advised him about setting timbers and examining the roof of the mine. They, also, specifically deny the conversation attributed to them by Saylor and his witnesses. The mine foreman denied that he was at Saylor's place of work at all on the day he sustained his injury, and engaged in a conversation with him.

The parties agree that Saylor was not at the time he sustained his injury engaged in making an unsafe place safe for work. And that the rule is, an employer

is under the duty to know that the place of work assigned to the employee‚ is reasonably safe, unless the unsafe condition was so recent that the foreman by the exercise of ordinary care could not have learned of the unsafe condition in time to prevent the employee's injury, and the latter must avoid known danger or dangers he could not have failed to know except by his own negligence. Helton v. Gunn Coal Mining Co., 258 Ky. 168, 79 S. W. (2d) 695; High Splint Coal Co. v. Baker, 247 Ky. 426, 57 S. W. (2d) 60.

The company was not operating, and Saylor was not working, under the Workmen's Compensation Act (Ky. Stats., sec. 4880 et seq.) at the time he sustained his injury. This fact deprived the company of the defenses of contributory negligence, assumed risk, and negligence of a fellow servant. Helton v. Gunn Coal Mining Co., 258 Ky. 168, 79 S. W. (2d) 695.

This deprivation of its right to these defenses does not make it an insurer of Saylor's safety or against his injury in the performance of his duties [Hall v. Proctor Coal Co., 246 Ky. 813, 34 S. W. (2d) 425. Big Sandy C. R. Co. v. Measell's Adm'r, 240 Ky. 571, 42 S. W. (2d) 747; Fee's Adm'r v. Mahan-Ellison Coal Corp., 241 Ky. 231, 43 S. W. (2d) 681; Codell Construction Co. v. White, 251 Ky. 574, 65 S. W. (2d) 690]; nor relieve him of the obligation to allege and prove negligence on the part of the mining company, or its superintendent, or its employees in charge of its mine at the time he sustained his injury and to establish by competent evidence casual connection between such negligence and his injury [West Ky. Coal Co. v. Shoulder's Adm'r, 234 Ky. 427, 28 S. W. (2d) 479; Gatliff Coal Co. v. Sumner, 196 Ky. 592, 245 S. W. 144; Duvin Coal Co. v. Fike, 238 Ky. 376, 38 S. W. (2d) 201].

Section 2726-4, Kentucky Statutes, imperatively imposed on the foreman and the assistant foreman the duty to examine Saylor's working place not less than twice a week while he was working and "to see" that his working place was properly secured by props or timbers and not to direct him to work in an unsafe place, except for the purpose of making it safe. Also, to provide him with sufficient props and timbers of suitable size. Section 2726-7, Kentucky Statutes, imposed on them the duty "to see" that Saylor, "before be-

ginning work" in the mine, "was advised" as to dangers incident to working therein.

As grounds of reversal, the coal company vigorously contends that it was entitled to a directed verdict because the evidence in behalf of Saylor, supplemented by its evidence, did not entitle him to recover. And the instructions "undertake to make the jury both triers of law and fact and contain vague, indefinite propositions of law as the basis of a recovery."

It is the contention of Saylor that the allegations of his petition and the evidence adduced in support thereof bring his cause of action within the purview of sections 2726-4 and 2726-7, and that his right to recover and the liability of the Southern Mining Company are not controlled by the "safe place doctrine."

The evidence fairly shows: (a) In the roof of the mine at the place Saylor was assigned to work were numerous "horsebacks" and "kettle bottoms"; (b) their presence was hard to detect by even experienced miners; (c) they were liable to fall at any moment, especially after they were exposed to the air; (d) Saylor was an inexperienced miner; (e) did his work carelessly and indifferently; (f) he had set only one timber at the outer edge of the "break through," leaving the roof otherwise unprotected; (g) he did his work within this space of ten or twelve feet, while removing the second cut of the coal; (h) the foreman advised him how to set timbers and to examine the roof; (i) no information was imparted to him as to the presence in the roof of "horsebacks" or "kettle bottoms"; (j) no directions were given him to be on his guard against them, or as to how to discover them or how close or frequent the timbers should be set to prevent them falling. The evidence is certain that those in authority over Saylor and his work knew, or by the exercise of ordinary care could have known, all of these facts, before he sustained his injury, in time to have accorded him protection against the falling of the "horseback" which fell upon and injured him.

The company and those in charge of his work owed him the duty to accord him the protection afforded by a reasonable compliance with sections 2726-4 and 2726-7. The rule is that a statute creates a liability per se for negligence only when it imposes the duty of

care for the special benefit of a particular group or class of persons, not when it merely defines a degree of care to be exercised under special circumstances in the interest of the general public. Schmidt v. Merchants Despatch Transp. Co., 270 N. Y. 287, 200 N. E. 824. And whether the duty to exercise ordinary care not to injure another is imposed by the common law or a statute, failure to perform the duty constitutes "negligence," and renders the party liable for injuries resulting therefrom. Crawford v. Atlantic Coast Line R. Co. (S. C.) 184 S. E. 569.

We think the casual connection between the negligence charged against the mining company and the injury sustained by Saylor, as is alleged in the petition, is reasonably inferable from the evidence; and, this because true, there can be no dispute as to the proposition that the question of casual connection between the alleged negligence and his injury was for the jury under proper instructions.

The test for determining whether the foreman or assistant foreman was negligent in observing or failing to observe the requirements of the statutes is, what reasonable person would have done in his position, seeing what he saw, knowing what he knew in the light of the circumstances of Saylor's situation and careless and indifferent manner in which he was doing his work, giving proper consideration to those things and matters which form the basis of, and ordinarily affect and influence, the judgment of prudent men engaged in ordinary mining of coal. Subject to the exercise of legal discretion, it was the duty of the jury to determine whether there was in this respect negligence on the part of the foreman and assistant foreman. It was the sole judge of the weight, effect, and sufficiency of the evidence to establish any fact for which it was offered. It was the sole judge of the credibility of the witnesses, and privileged to believe all the testimony of a witness or believe a part and reject part as it might have been convinced of the truth or falsity of his testimony, whether it arose from interest, willfulness or mistake. And it was its duty to reconcile conflicting evidence where it was possible to do so, and its findings cannot be set aside by the court unless they are found to be without support upon a full

consideration of the whole evidence. It would not have been proper for the trial court under the evidence to have directed a verdict upon the ground that the mining company and its employees superior in authority to Saylor were guilty of no negligence constituting the proximate cause of the injury. The evidence demonstrates that the company and its employees largely omitted to observe the requirements of the statutes. The company argues that their non-compliance therewith was not the proximate cause of his injury. The failure to observe them resulted in the "horseback" not being supported by proper timbers, and there is some evidence showing that had it been so supported it would not have fallen as and when it injured him.

The company as a defense alleged and attempted to prove that his failure "to observe the necessary and usual precautions to prevent an accident or injury to himself," in that he "failed to make the roof of the mine safe by propping or timbering it," and this was the sole cause of the falling of the "horseback" upon him.

It should be considered that the evidence establishes he was negligent. Therefore, the determinative question is, Was his own negligence the sole cause of his injury, or was his negligence combined with that of the company's foreman, assistant foreman, and superintendent, or either of them, the proximate cause thereof? If the latter, his right to recover of it must be considered as established by the evidence. The evidence to a disinterested and impartial mind establishes beyond cavil, doubt, or question that at least the combined negligence of Saylor and the company's foreman and assistant foreman in charge of Saylor and his work, at the time and place he was injured, was the proximate cause of his injury. The company argues that it is absurd so to construe the above sections of the statutes, as to exact of it a strict compliance therewith, or so to apply them to the developed facts and the allegations of Saylor's petitions as to impose a liability on it, for his injury.

An election to operate, and operating, under the Workmen's Compensation Law will afford complete protection against such construction and application.

The company argues that the instructions are erroneous in that they leave the jury to judge the law and facts. Instruction No. 1 clearly and succinctly sets forth Saylor's theory according to the allegations of his petition and as authorized by sections 2726-4 and 2726-7. It futher properly defines the right of Saylor and the duty of the mining company, if it believed from the evidence that the mining company assured him that his place of work was reasonably safe, and if it believed from the evidence that it was not reasonably safe, and that Saylor knew, or by the exercise of ordinary care on his part could have known that it was not a reasonably safe place in which to work. Instruction No. 2 accurately informed the jury that if it believed from the evidence the mining company was negligent as set forth in Instruction No. 1, and that Saylor was negligent, and by reason of his own negligence and that of the mining company he sustained his injury, it was its duty to find for him. This instruction also properly informed the jury if Saylor was negligent, as therein set forth, and his negligence was the sole cause of his injury to find for the mining company. Instruction No. 2½ was given at the request of the mining company, of which it cannot complain. No. 3 correctly stated the measure of damages. No. 4 defined the terms "negligence and ordinary care." No. 5 informed the jury the number of its members necessary to sign a verdict if the twelve failed to agree.

Our review of the given instructions is sufficient to show that as a whole they fairly presented Saylor's right to recover and the mining company's defense. They are not subject to the criticism urged against them. See West Ky. Coal Co. v. Shoulders' Adm'r, 234 Ky. 427, 28 S. W. (2d) 479; Duvin Coal Co. v. Fike, 238 Ky. 376, 38 S. W. (2d) 201; Big Sandy C. R. Co. v. Measell's Adm'r, 240 Ky. 571, 42 S. W. (2d) 747; Helton v. Gunn Coal Mining Co., supra.

Numerous collateral questions are discussed in the briefs of the parties, but in view of our stated conclusions, we deem it unnecessary to extend this opinion to discuss them.

The judgment is affirmed.