## Clover Splint Coal Co. v. Lorenz.

(Decided Nov. 19, 1937.)

FORESTER & CARTER for appellant.

J. L. WILLIAMS for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

On May 19, 1934, appellee, a miner employed by appellant, received injuries by the falling of a piece of slate. On November 14, 1935, he filed petition seeking recovery for the injury, in which he alleged, among other causes, that his injury was occasioned by appellant's negligence in requiring him to pursue his work in a dangerous and unsafe place; failed to furnish him a reasonably safe place to work, and that the dangerous and unsafe condition of the place where he was working was known to appellant, and unknown to him at the time.

Appellant traversed the allegations of the petition, and in a second paragraph (by way of amendment) pleaded limitations, truly asserting that appellee's action was instituted more than one year after the date of injury. A reply admitted the delay, but in avoidance pleaded that appellant had agreed that it would pay him for his injuries if he would not file suit, and appellee

relied on the promise, put, when it was too late for him to file within the requisite time, the appellants refused to settle. The reply was controverted of record. Later appellant filed an amended answer, alleging by way of set-off, an indebtedness of appellee in the sum of $597.50, for merchandise furnished him from the company store, and accounts paid for him, including medical bills. A reply was controverted of record, and on submission the jury found for appellee in the sum of $1,097.50, and under appropriate instruction offset the award by $597.50. At the close of all testimony the court overruled appellant's motion for a directed verdict.

There is no dispute in respect of the following facts: Appellee was injured by a piece of falling or slipping slate; by the resulting injury his earning power was partially impaired. He was an experienced miner, having worked in appellant's mines for seven years, and for many years prior thereto in other mines. On the day of the accident he was engaged, for the first time, in loading coal on left entry No. 4. His "cut boss" had sent him into this entry early that morning. The coal had been undercut up to the face of the entry. He and a fellow workman shot the coal, and from then on to the time of the injury Lorenz was loading both coal and slate. His version of the accident is substantially as follows:

Before the accident appellee had "loaded out" five cars of coal and one car of slate, all of which had been "pulled down" by appellee. This carried his work back to the face of the coal. The piece of slate did not fall from the roof; it had been shot loose with the coal, and was resting against a rib of coal. The slab, as described by appellee, was about 3½ feet long, 2½ feet wide, and 6 inches thick. As to what happened shortly before the slab fell there is conflict. Appellee says it was his duty to clean off the slate and load it out; so does the cut boss. Appellee was attempting to clean it off for the purpose of loading it out, when the cut boss came up and said: "Leave the slate and load out the coal." Appellee answered, "I haven't got time to load the coal and slate too, and he say 'Leave the slate and load the coal,' and I do what he say." Appellee also said that he was trying to work out the slate to "make it safety."

The cut boss left, and in a short time the motorman

came in with an empty, and appellee started to load coal; the slate slipped or fell, striking him first on the right shoulder knocking him down, then striking him in the back, and one part fell on his right foot, the latter blow causing him the most serious injury. The cut boss, in the main, corroborated appellee in his description of the slate and its position, but contradicted him otherwise. He says when he went into the entry where Lorenz was working on the right side of the car he saw a piece of slate "about four or five feet, in a wedge-shape against the rib on the right; it was give down. You could stick your hand over it between the mine top and the draw slate; it was resting on the loose coal. Lorenz was shoveling coal; he had made a hole from the right rib from the face, and I said, 'Don't you make another step before you take that slate down,' and he said, 'As soon as I get these few shovels of coal, I take it down.' " On rebuttal Lorenz denied making such statement.

An issue of fact also arises on the question of whether or not appellant was estopped to plead limitation. The petition was admittedly filed more than one year after the accident, but it is appellee's contention that the statute was tolled, because after his injury he talked to Mr. Graham, a superintendent, who told him three or four times that he was going to settle with him; was to give him a good job, "any kind of job I wanted in the mines, and that he will pay me, but Mr. Graham he quit for Clover Splint." Later, he talked with Mr. Matthews, who succeeded Mr. Graham as superintendent. He testified:

"Mr. Matthews tell me he going to give me a good job, and pay me something not to file suit. I tell him if he no give money what he promise I going to sue. He can no say nothing. When the year was up he say he no want to settle with me. I tell him if they no settle, and he promise he was going to settle and give me money too. I told him four times. He ask me not to sue and I believe him, is the reason why I did not sue."

He says they did not agree to pay him any specific sum, but:

"He say he going to give me money."

"Q. How much were you asking him? A. I never ask. He say he give me money; he say when

I tell him I am going to sue, he tell me the other time he will see how much money he going to give me."

With particular relation to a conversation with Matthews, who came to the mines in February, 1935, appellee says:

"He tell me when I ask him the time come off, the year will be off and me go to settle it up and he said, 'We are going to settle it up, but the company is broke,' and after that me no speak for that no more, and after that I ask him again, and he tell me it was in May, I don't know what day it was, he tell me, he say, 'I am going to call you up when I settle,' and he call me up on the 19th of May, the last day of the year, and the year was up and call me up that time."

Appellee had been to see a lawyer in Pineville for the purpose of having him file suit, and a letter was referred to but not presented here, which it is said evidenced that on December 4, 1934, appellee had employed an attorney to file suit, but he said he had a talk with the superintendent after he went to Pineville to employ a lawyer. Both superintendents testified that neither ever requested Lorenz not to file suit, but one of them did discuss with him the matter of compromising his claim in a manner to which appellee would not agree. Graham says that he never at any time promised appellee he would settle for his injury; that appellee was not kept on the pay roll, but did work and the company advanced him credit for merchandise, as it had done for other disabled employees.

A witness introduced by appellant to rebut appellee's statement about a conversation with Matthews in May, 1935, says that nothing was then said about giving appellee a good job if he would not sue. The question of lawsuit was not discussed. Another witness who was present says that at the time no promise was made to appellee based on an agreement not to file suit, but that Matthews told Lorenz the company was not responsible for his injury, and, in order to save expense of a suit, they made him a proposal and "he refused to sign anything." This seems to have occurred just a few days before the expiration of the time in which suit could be filed under the statute.

The pleadings manifest that appellant was not op-

erating under provisions of the Workmen's Compensation Act at the time of the accident, yet under the law was subject to its conditions and provisions. Kentucky Statutes, secs. 4880-4987; Hall v. Proctor Coal Company, 236 Ky. 813, 34 S. W. (2d) 425. Thus operating, the employer, as it apparently recognized, is not entitled to the defenses of contributory negligence, assumed risk, or negligence of a fellow servant. Hall v. Proctor Coal Co., supra. The application of this law, however, does not relieve the injured person of the burden of alleging and proving negligence, and of establishing causal connection between the act of negligence and the injury. Therefore we are to look to the evidence to see if there was any negligent act proven on the part of the employer causing injury, and, if it so appears, liability attaches even though the employee's negligence was a contributing factor along with the negligence of the employer, or its officers superior to the injured employee. Southern Mining Company v. Saylor, 264 Ky. 655, 95 S. W. (2d) 236.

The testimony detailed above in relating the colloquy between Lorenz and the cut boss raised a sharp issue of fact which was submittable, and was submitted, to the jury under an instruction most favorable to appellant, and, since there was evidence authorizing the submission, the jury's determination is conclusive unless it be palpably against the evidence. Southern Mining Company v. Saylor, supra.

This feature of the case seems to us to be controlled by our opinion in the case of Read v. Carter, 266 Ky. 346, 98 S. W. (2d) 464, 466. In that case appellee was injured by a defective saw while sawing logs. It was argued that, because Carter had alleged in his petition that the saw was out of line, and so advised defendants, Carter had no cause since the danger was obvious to him. The proof adduced also showed that Carter had called Read's attention to the condition of the saw, and Read told him to go ahead and use it, which he did, and was afterwards injured. The court in affirming a judgment holding the employer liable, after distinguishing some of our cases, particularly Steely v. Great A. & P. Tea Company, 256 Ky. 586, 76 S. W. (2d) 900, cited Mannington Fuel Company v. Ray's Adm'x, 250 Ky. 736, 63 S. W. (2d) 933, as laying down a correct rule, and said:

"Where the servant is put to work to make a

dangerous place or a dangerous tool safe, there is no negligence on the part of the master unless the servant does not know of the danger and the master fails to warn him of it. In other words, the negligence in these cases consists in the failure to warn. On the other hand, where the negligence relied on is the failure to furnish * * * a safe place to work, the master's negligence consists per se in the failure to furnish * * * a safe place. In this situation, even though the servant * * * continues to work in an unsafe place, his assumption of risk, or contributory negligence, is no bar where the employer is eligible to operate under the Workmen's Compensation Law but elects not to do so. It follows that the petition in the case at bar was not defective in failing to negative the knowledge of Carter of the defective condition of the saw with which he was working."

Appellant also insists that there was a fatal variance between the pleadings and the evidence. We can not agree that there was any variance, except in the one point, i. e., that appellee had no knowledge of the danger. This was not of such materiality as to mislead appellant. If appellant conceived the variance to have been misleading, it was his duty under section 129 of the Civil Code of Practice to have demonstrated such situation to the court, whereupon the court, if satisfied of the correctness of the contention, would no doubt have followed the provision of the Code, supra. Manual's Adm'r v. Caldwell & Co., 270 Ky. 285, 109 S. W. (2d) 635.

We come now to the plea of stoppage of limitation.

The proof bearing thereon has been recited above. It may be first noted that the court submitted the issue of fact to a jury in a properly phrased instruction. Counsel insists that, while appellee's pleading states that appellant promised to pay the appellee, and requested him not to sue, kept him at work and paid him, the pleading is defective in not alleging that he relied upon these promises and agreed not to sue; that the proof shows that, although appellee had been continued in work, not on the regular pay roll, but at odd jobs around the mines, he had made no agreement not to sue, and, if he had so done, he abandoned his purpose, since within the limitation period he had employed a lawyer to file suit.

On the facts adduced appellant cites the case of Chesapeake & N. Railway v. Speakman, 114 Ky. 628, 71 S. W. 633, 24 Ky. Law Rep. 1449, 63 L. R. A. 193. In that case it appeared that, after Speakman was injured, he and the superintendent had agreed that, if appellee would not sue, his time would be allowed to run on and his wages paid until he recovered, and also that he would be paid by the company for his injury when its extent was ascertained, and that appellee should have a permanent position. There we held appellee's plea of obstruction of the statute to be sound because of the agreement, promises and acts of appellant. However, appellant contends that the Speakman Case is not applicable, because appellant did not plead nor prove an agreement not to sue. While appellee does not say in so many words: "In view of your promises I agree that I will not sue," the reply sufficiently pleads that it was because of the promises and acts of appellant that he did not sue. He pleads, and in his crude way says he did not sue, because he relied on the promises made and acts done, but for which he would have sued before the expiration of the year.

Counsel relies on the case of Reuff-Griffin Decorating Company v. Wilkes, 173 Ky. 566, 191 S. W. 443, 445, in which the plea of stoppage of limitations was based on the following language: "Well, he told me that he would carry me on * * * the regular payroll until I got well or able to go to work." We held that since there was no mention of a suit, the limitation was not tolled. "It was merely a voluntary statement, according to this testimony, of Griffin, that he would be kept on the pay roll, without the exacting of plaintiff any character of promise whatever, * * * and it was soon discovered by the plaintiff that the defendant did not regard it as a contract or a binding promise." The Speakman Case is differentiated in Kentucky Utilities Co. v. Wiggins, 254 Ky. 629, 72 S. W. (2d) 12, 15, because in the latter case "no promises or representations were made to appellee and no payment made to him."

Louisville & Nashville Railroad Company v. Carter, 226 Ky. 561, 10 S. W. (2d) 1064, 1070, applies with much force here. There, in answer to appellant's plea of limitation, Carter replied that the appellant through its agents had promised him after the accident, if he would not sue, it would pay his hospital and doctors' bills; keep him on the pay roll and later on settle his claim,

and continued to make such promises from time to time until the Frankfort & Cincinnati Railroad went into the hands of a receiver, and that appellee in reliance on these promises (no actual agreement being otherwise shown) had not brought suit. The court in holding Carter's plea good said:

> "This estoppel pleaded by the appellee, if sustained by the proof, was a complete answer to the plea of limitations [citing Speakman Case, supra]. Appellant seems to think this case was overruled by the recent case of Thompson v. Wisconsin Steel Company, 214 Ky. 221, 282 S. W. 1081, but that is not so. In the Thompson Case there was a clear contract of settlement. The terms of the settlement were definite and certain, except as to the amount to be paid. * * * The agreement pleaded in that case was a complete substitute for the original cause of action. In the Speakman Case, however, there were no definite terms of agreement, but only one to settle a claim at some time in the future, which agreement was too indefinite and uncertain to be enforced in court as a contract, but sufficiently so as to operate as an estoppel against the railroad. The agreement here pleaded was of the character of the agreement in the Speakman Case. * * * Although the evidence was contradictory as to whether or not any such agreement as appellee pleaded had been made, yet the issue was properly submitted to the jury under appropriate instructions, and its finding cannot be said to be against the evidence on this point."

While the opinion says the "agreement" in the Carter Case was of the nature of the one in the Speakman Case, we do not find it said in the Carter Case that Carter pleaded that he had "agreed" not to bring suit, but "in reliance on these promises, had not brought suit." We cannot distinguish the promises and actions of the appellant here from the appellant's promises and actions in the Carter Case, and we are of the opinion that the proof of appellee was sufficient to take the case to the jury and uphold its verdict, since, as we read the record, the promises and representations made appellee were sufficient to and did obstruct the running of the statute. We might observe that the proof shows that within a few days prior to the last filing day there was, as admitted by the superintendent, an effort to settle

He says it was on May 15, 1935, and he is corroborated in this statement by a witness, who says that on that day Mr. Matthews was explaining to Lorenz that the conditions under which he was injured were such that the coal company was not responsible, but, in order to avoid a lawsuit, undertook settlement. This was perhaps the time to which Lorenz referred as being the last conference between him and the superintendent, when the latter, as claimed by Lorenz, said he would call him up and did so on May 19, telling him that no settlement would be made. This, in connection with other proven facts, disarmed appellee, and prevented compliance with the statute.

We are convinced that appellant received a fair and impartial trial; that the verdict is not palpably against the evidence; and that no error prejudicial to appellant was committed by the court, and consequently must affirm the judgment.